IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PUROON, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) 16 C 7811 |
| MIDWEST PHOTOGRAPHIC | ) |
| RESOURCE CENTER, INC., | ) |
| | ) Judge John Z. Lee |
| Defendant. | ) |
| | ) |
| | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Puroon, Inc. ("Puroon") brought this action against Defendant Midwest Photographic Center, Inc. ("Midwest"), arising out of agreements the parties purportedly made with regard to the development of a photo-album product. Puroon brings claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.* (Count I); as well as for fraud (Count II); breach of contract (Count III); breach of oral contract (Count IV); breach of implied contract (Count V); unjust enrichment (Count VI); tortious interference with prospective business advantage (Count VII); and trade-secret misappropriation under both the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/1 *et seq.* (Count VIII) and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1) (Count IX).

Puroon has moved for partial summary judgment as to its claim that Midwest breached a non-disclosure agreement (Count III) and as to whether non-party

manufacturer Sae Kim acted as an agent of Midwest—a subsidiary issue of several counts. In turn, Midwest has moved for summary judgment on all counts. For the reasons given herein, Midwest's motion is granted in part and denied in part, and Puroon's motion is denied.

### Factual Background[1]

Puroon is a Delaware corporation with its principal place of business in Chicago, Illinois. Pl.'s LR 56.1(a)(3) Stmt. ¶ 1, ECF No. 60. Elli Hyunju Song is its founder and CEO. *Id.* Midwest is a Missouri corporation based in St. Peters, Missouri. Def.'s LR 56.1(a)(3) Stmt. ¶ 1, ECF No. 63. Michael Daniel is an owner and designer for Midwest, which provides photographic albums and other products for professional photographers. *Id.* ¶¶ 1, 5, 41.[2]

In 2013, Song developed the "Memory Book," Pl.'s LR 56.1(a)(3) Stmt. ¶ 8, "an all-in-one convertible photo frame, album, and scrapbook," *id.* ¶ 6. The Memory Book "includes a magnetic opening and interchangeable outside view." *Id.* Song filed for a utility patent on the product in March 2014. *Id.* ¶ 8.

---

[1] The following facts are undisputed or have been deemed admitted, unless otherwise noted.

[2] Puroon contends that the deposition testimony (including that of Michael Daniel), which supports these and other statements of fact is categorically inadmissible hearsay. But that is not so at summary judgment. *See* Fed. R. Civ. P. 56(c)(1)(A). Puroon also argues that a party may not cite to its own deposition testimony and similar evidence to support its statements of fact. This is also incorrect. *See Hill v. Tangherlini*, 724 F.3d 965, 967–68 (7th Cir. 2013) ("[A party's own] [d]eposition testimony, affidavits, responses to interrogatories, and other written statements by their nature are self-serving. . . . As we have repeatedly emphasized over the past decade, [such evidence is] perfectly admissible . . . at summary judgment.") (internal citation omitted)).

Sometime in the summer of 2013, Puroon launched a publicly available website that displayed the Memory Book, including a video. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 19–21. That same summer, Song displayed 20 to 30 samples of the Memory Book at a homeware trade show in Atlanta, *id.* ¶ 23, where attendees were able to interact with the product, *id.* ¶ 24. Two attendees at the Atlanta trade show told Song that they represented the company Shutterfly and might be interested in the Memory Book. *Id.* ¶ 25. Song sent them two samples of the Memory Book without having them sign a non-disclosure agreement ("NDA"). *Id.*; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3, ECF No. 69-1. Song also showed samples of the Memory Book at a trade show at the Merchandise Mart in Chicago. Def.'s LR 56.1(a)(3) Stmt. ¶ 26.

Then, in 2014, Song had a video made of the "second-generation" Memory Book, and she shared it with several people, including a buyer from QVC and an unspecified person from Lifetime Brand, again without having them sign NDAs. *Id.* ¶¶ 27–28, 30. Song also sent the QVC buyer a sample product without an NDA. *Id.* ¶ 29.

In early November 2014, Song contacted Tim Gau, Midwest's Operations Manager, to see if Midwest could assist Puroon in manufacturing and marketing the Memory Book, Pl.'s LR 56.1(a)(3) Stmt. ¶ 9, and she sent Gau a YouTube link to a video of the Memory Book, *id.* ¶ 10; Def.'s LR 56.1(a)(3) Stmt. ¶ 37. Then, on November 10, 2014, Gau signed on behalf of Midwest an NDA that Song had prepared and countersigned. Pl.'s LR 56.1(a)(3) Stmt. ¶ 13; Def.'s LR 56.1(a)(3) Stmt. ¶ 38.

3

The NDA identified as protected information a "Memory Book—Convertible photo frame, album and scrapbook with magnetic opening and interchangeable outside view." Pl.'s LR 56.1(a)(3) Stmt. ¶ 14. It forbade Midwest from "us[ing] Subject or its related confidential information in the development, production or marketing of any modified or improved item that is similar to Subject without Inventor/Owner's consent." *Id.* ¶ 15.

After Midwest signed the NDA, Song transmitted the Memory Book specifications to Gau, who then transmitted them to Sae Kim. *Id.* ¶ 16. Kim manufactured products that Midwest sold and developed for its clients. *Id.* ¶ 17.

After Kim reviewed the Memory Book specifications, he sent pricing information to Gau, who then relayed them to Song on November 17, 2014. *Id.* ¶ 20. Song responded with a request for samples of a completed product. *Id.* Gau then told Song that he had sent Song's requests to Kim and that Kim was looking into costs and when a sample could be produced. *Id.* ¶¶ 21–22.

Song testified that at some time after this communication, Kim contacted Song directly to discuss the manufacture of the Memory Book, and Kim and Song communicated with one another for several months to facilitate the production of prototype samples. *Id.* ¶¶ 22–23. According to Song, in March 2015, Kim sent Song a prototype that she did not like. *Id.* ¶¶ 26–27. Kim never sent Song any additional prototypes. *Id.* ¶ 29.

Daniel testified that he was not aware that Song had met with Kim overseas or had entered into an agreement with Kim. Def.'s LR 56.1(a)(3) Stmt. ¶ 46. After

Song began speaking directly with Kim, she never again communicated with Gau or any other employee of Midwest. *Id.* ¶ 47. Song was the only Midwest customer who had placed an order directly with Kim. *Id.* ¶ 48. All other customer orders have gone through Midwest. *Id.*

Starting in 2009, Midwest had begun producing at least one photo-album-type "display case" product that utilized magnetic technology. Def.'s LR 56.1(a)(3) Stmt. ¶ 8. At an unspecified time after November 2014, Song learned that Midwest was marketing a product with an exterior photograph display and an interior that held photograph mats for storing pictures. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 30–32. The exterior display of this product utilized embedded magnets to allow photographs to be interchanged. *Id.* Midwest referred to this product as both a "Professional Matted Display Case" and "Professional Mat Box." *Id.* ¶ 33.

The parties dispute whether, prior to Song's communications with Midwest, Midwest had manufactured a photo-box product that utilized magnets to adhere a photograph to its front cover. *Id.* ¶¶ 34, 36; Def.'s LR 56.1(a)(3) Stmt. ¶¶ 9, 13, 14, 15. The parties agree that the first time Midwest launched a version of the product with a non-square, rectangular photo display was after Song contacted Midwest. Pl.'s LR 56.1(a)(3) Stmt. ¶ 35. Daniel testified that he decided to use a non-square rectangular opening for this version of the product based on customer feedback. Def.'s LR 56.1(a)(3) Stmt. ¶ 16. Song testified that, prior to developing the Memory Book, she had seen products in which magnets were used to hold a photo in place. *Id.* ¶ 17.

Based on these events, Puroon claims that Midwest engaged in deceptive or unfair business practices, in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 Ill. Comp. Stat. 505/1 *et seq.* (Count I); committed fraud (Count II); breached contracts (Count III); breached an oral contract (Count IV); breached an implied contract (Count V); was unjustly enriched (Count VI); tortiously interfered with Puroon's prospective business advantage (Count VII); and misappropriated Puroon's trade secrets, in violation of both the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065/1 *et seq.* (Count VIII) and the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1) (Count IX).

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). The Court gives the nonmoving party "the benefit of

conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

Moreover, Rule 56 "requires the district court to grant a motion for summary judgment after discovery 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 743 (7th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)), *overruled on other grounds by Ortiz v. Werner Enters.*, 834 F.3d 760 (7th Cir. 2016). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See Celotex,* 477 U.S. at 322. Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *See id.* at 321–22.

## Analysis

### I.     ICFA Claim (Count I)

In Count I, Puroon alleges that Midwest engaged in unfair business practices and unfair competition in violation of the ICFA, 815 Ill. Comp. Stat. 505/1 *et seq*. In seeking summary judgment as to this claim, Midwest contends that Puroon is not a consumer and that no "consumer nexus" exists as required by the ICFA. Def.'s Mem. Supp. at 15, ECF No. 62. In response, Puroon states that it no longer wishes to pursue

7

this claim. Pl.'s Resp. at 14, ECF Nos. 68, 69. Accordingly, Midwest's motion for summary judgment as to this claim is granted.

## II. Claims for Fraud, Unjust Enrichment, and Tortious Inference (Counts II, VI, and VII)

In Counts II, VI, and VII, Puroon asserts claims under Illinois common law for fraud, unjust enrichment, and tortious interference. In moving for summary judgment on these claims, Midwest contends that these state law claims are preempted by the ITSA, 765 Ill. Comp. Stat. 1065/1 *et seq.* Def.'s Mem. Supp. at 24–25. Puroon disagrees, arguing that it is asserting them in the alternative to the ITSA claim. Pl.'s Resp. at 14.

"With a handful of enumerated exceptions, the Illinois General Assembly proclaimed that the ITSA 'is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret.'" *Christopher Glass & Aluminum, Inc. v. O'Keefe*, No. 1:16-CV-11532, 2017 WL 2834536, at *2 (N.D. Ill. June 30, 2017) (quoting 765 Ill. Comp. Stat. 1065/8). The exceptions consist only of claims seeking "(1) contractual remedies; (2) other civil remedies that are not based upon misappropriation of a trade secret; (3) criminal remedies; and (4) the definition of a trade secret contained in any other Illinois statute." *Christopher Glass*, 2017 WL 2834536, at *2.

Unjust enrichment claims are not exempt from preemption. *See Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014). Nor has Puroon provided any authority for the notion that its fraud and tortious interference claims

8

should be exempt. *See Cooper v. Lane*, 969 F.2d 368, 372 (7th Cir. 1992) ("[L]egal arguments . . . not presented to the district court . . . were thereby waived.").

Furthermore, given that the ITSA has displaced these claims altogether, a plaintiff cannot assert them in the alternative to avoid preemption. *See, e.g., Am. Ctr. for Excellence in Surgical Assisting Inc. v. Cmty. Coll. Dist. 502*, 190 F. Supp. 3d 812, 823 (N.D. Ill. 2016). As a result, the Court concludes that the ITSA preempts Counts II, VI, and VII, and Midwest is granted summary judgment as to those claims.

### III. Claims for Breaching Prototyping Contract (Counts III, IV and V)

In Counts III, IV and V, Puroon alleges that Midwest breached a contract, as well as an "oral" and "implied" contract, when it failed to create ten prototypes of the Memory Book in exchange for $1,000. Am. Compl. ¶¶ 39–52, ECF No. 31. In seeking summary judgment, Midwest makes two arguments. First, it contends that the only evidence Puroon has marshaled to show that the parties agreed to a $1,000 contract are out-of-court statements by Kim; it further contends that these statements are inadmissible hearsay. Def.'s Mem. Supp. at 17–19. Second, it argues that, even if there were evidence of a contract, no reasonable jury could conclude that Kim had apparent authority to bind Midwest to it. *Id*.

Puroon responds that there is evidence that Kim acted as Midwest's agent, and thus could bind Midwest to the prototype contract. Pl.'s Resp. at 15; *see* Pl.'s Mem. Supp. at 12–15, ECF No. 59. In making this argument, however, Puroon relies on Kim's own statements as evidence of his apparent authority. Pl.'s Mem. Supp. at 14–15. For example, Puroon argues that it reasonably believed that Kim was acting on

9

behalf of Midwest when he explained that Midwest was "a company that [Daniel] and I [Kim] do together," Pl.'s LR 56.1(a)(3) Stmt. ¶ 24, and when he referred to a Chinese factory as "our factory," namely, "the factory of Midwest Photographic," *id.* ¶ 25. But as Midwest correctly notes, statements by a purported agent alone cannot create apparent authority. Def.'s Mem. Supp. at 12–14. *See Smith v. State Farm Mut. Auto Ins. Co.*, 30 F. Supp. 3d 765, 778 (N.D. Ill. 2014) ("It is well-established that apparent authority must derive from the statements or actions of the alleged principal, not the alleged agent.") (citing *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000)).

Puroon also contends, however, that Gau, an employee of Midwest, made statements suggesting that Kim was an agent of Midwest. Pl.'s Resp. at 15. For example, when Song reached out to Gau to inquire about the progress of the manufacturing proposal, Gau replied: "They are looking into what the costs will be and when *we* could produce a sample. I will let you know when I hear back from Sae [Kim]." Pl.'s LR 56.1(a)(3) Stmt. ¶ 21 (emphasis added by Plaintiff). A reasonable juror could understand this statement to imply that Kim was, like Gau, an agent of Midwest.

Accordingly, there is a genuine dispute of fact concerning whether Kim had authority, apparent or otherwise, to act on behalf of Midwest. If Kim *did* have such authority, his statements would be admissible to establish the existence of the $1,000 prototype contract. *See* Fed. R. Evid. 801(d)(2)(D) ("A statement . . . is not hearsay . . . [if] offered against an opposing party and . . . made by the party's agent

10

or employee on a matter within the scope of that relationship and while it existed."); *Mister v. Ne. Ill. Commuter R.R. Corp.*, 571 F.3d 696, 698 (7th Cir. 2009). Midwest is therefore not entitled to summary judgment on Puroon's breach-of-contract claims arising out of the $1,000 prototype contract (III, IV, and V). Because there is a genuine issue of material fact, however, Puroon also is not entitled to summary judgment on the issue of Kim's agency.

## IV. Claims under the ITSA and DTSA (Counts VIII and IX)

In Counts VIII and IX, Puroon claims that Midwest misappropriated trade secrets that it acquired from the Memory Book. Am. Compl. ¶¶ 62–87. In seeking summary judgment as to these claims, Midwest contends that no reasonable jury could conclude that the information at issue qualifies as a trade secret or that Midwest misappropriated it. The parties agree that the ITSA and DTSA may be analyzed under the same framework "because the pertinent definitions of the two acts overlap." *Molon Motor & Coil Corp. v. Nidec Motor Corp.*, No. 16 C 03545, 2017 WL 1954531, at *2–3 (N.D. Ill. May 11, 2017).

To succeed on a claim for misappropriation of trade secrets under the ITSA, a plaintiff must establish that the information was: (1) a trade secret; (2) misappropriated; and (3) used in the defendant's business. *See Learning Curve Toys, Inc. v. PlayWood Toys, Inc.*, 342 F.3d 714, 721 (7th Cir. 2003). The ITSA defines a "trade secret" as information that "(1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are

11

reasonable under the circumstances to maintain its secrecy or confidentiality." 765 Ill. Comp. Stat. 1065/2(d).

"Typically, what measures are reasonable in a given case is an issue for a jury. In some circumstances, however, it may be readily apparent that reasonable measures simply were not taken." *Tax Track Sys. Corp. v. New Inv'r World, Inc.*, 478 F.3d 783, 787 (7th Cir. 2007); *see CMBB LLC v. Lockwood Mfg., Inc.*, 628 F. Supp. 2d 881, 883–84 (N.D. Ill. 2009) (entering summary judgment for the defendant because no jury could reasonably conclude that the plaintiff took reasonable measures to maintain secrecy).

"Although the [ITSA] explicitly defines a trade secret in terms of these two requirements, Illinois courts frequently refer to six common law factors (which are derived from § 757 of the Restatement (First) of Torts) in determining whether a trade secret exists: (1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Learning Curve Toys*, 342 F.3d at 722 (citing Illinois case law).

In addition, "[a] trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process,

12

design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." *3M v. Pribyl,* 259 F.3d 587, 595–96 (7th Cir. 2001) (citing *Syntex Ophthalmics, Inc. v. Tsuetaki,* 701 F.2d 677, 683 (7th Cir. 1983) (applying Illinois trade-secret law)). But the combination must "transform[] the individual features into something that is itself secret, *i.e.* not generally known or easily duplicated by the industry." *Fast Food Gourmet, Inc. v. Little Lady Foods, Inc.*, 542 F. Supp. 2d 849, 862–63 (N.D. Ill. 2008) (citing *Computer Care v. Serv. Sys. Enters., Inc.,* 982 F.2d 1063, 1074–75 (7th Cir. 1992)).

Here, Midwest contends that Puroon has failed to identify with specificity what exactly about the Memory Book is a trade secret. Def.'s Mem. Supp. at 20–22. Midwest further argues that, in any event, Puroon has failed to maintain the confidentiality of whatever Puroon believes is secret. *Id.* Finally, assuming that the purported trade secret is the "embedded magnetic technology" that the Memory Book uses to hold a photograph in place, Midwest contends that this technology was generally known before Song designed the Memory Book. *Id.*

In response, Puroon contends that critical design and manufacturing specifications ("manufacturing specifications") were made available to Midwest only after the parties agreed to the NDA, and that Puroon had not divulged this information to any other parties. This includes information on the "the thickness of the paper . . . , the kinds of magnets . . . , where such magnets should be placed, and how such magnets should be attached." Pl.'s Resp. at 18.

13

As for the general concept of embedded magnets, Puroon concedes that, prior to developing the Memory Book, Song had seen products where a frame held a photo in place by magnets. Def.'s LR 56.1(a)(3) Stmt. ¶ 17. To be sure, Puroon attempts to downplay this, stating that "Ms. Song had not seen products that used magnets in the same way as the Memory Book," Pl.'s Resp. Def.'s LR 56.1(a)(3) Stmt. ¶ 17, ECF No. 69-1. But Puroon does not explain in what ways the use of magnets in the Memory Book differed from the manner in which magnets were used in pre-existing products.

The manufacturing specifications, however, are a different matter. It is undisputed that Song did not provide these specifications to Midwest until it agreed to sign an NDA, and she did not provide these specifications to any other entities. Pl.'s LR 56.1(a)(3) Stmt. ¶ 16; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 9–10, 12; Pl.'s Resp. Def.'s LR 56.1(a)(3) Stmt. ¶ 39. What is more, Midwest does not contend that the manufacturing specifications of the Memory Book were generally known in the industry or that they were otherwise not unique. Given that the question of "whether certain information constitutes a trade secret ordinarily is best resolved by a factfinder," *Rockwell Graphic Sys., Inc. v. Dev. Indus., Inc.*, 925 F.2d 174, 179 (7th Cir. 1991), whether the manufacturing specifications of the Memory Book constitute a protectable trade secret is a matter best left to the jury.

Midwest also contends that Puroon did not take adequate measures to protect its secret. Def.'s Mem. Supp. at 21–22. It is true that Song showed physical prototypes of the Memory Book at multiple trade shows, Def.'s LR 56.1(a)(3) Stmt.

14

¶¶ 23–24, 26, and that Song also sent samples of the product to representatives of Shutterfly and QVC, *id.* ¶¶ 25, 29. Midwest argues that Puroon's disclosure of physical prototypes puts its actions within the scope of *National Presto Industries v. Hamilton Beach, Inc.*, in which the plaintiff was found to have abandoned its trade secrets in a similar manner. No. 88 C 10567, 1990 WL 208594, at *8–*9 (N.D. Ill. Dec. 12, 1990).

*National Presto* is distinguishable, however, because in that case, the plaintiff undisputedly showed the product to over 500 customers and sold the product at one of its factory outlet stores. *Id.* Here, although it is undisputed that Song brought the Memory Book to two trade shows, there is no evidence as to how many customers saw it. What is more, Midwest's argument relies on an assumption that the customers who viewed the product at the trade shows were privy to the alleged trade secrets—the combination of design elements and specific technical details and measurements. *See* Pl.'s Resp. at 18. But there is no evidence that trade-show attendees could have identified the Memory Book's manufacturing specifications by merely looking at or handling the prototype. Rather, based upon this record, a reasonable juror could conclude that such details were not readily observable.

Nor is the fact that Song sent prototypes to Shutterfly and QVC dispositive. Although Puroon did not require the Shutterfly or QVC representatives to sign NDAs, Def.'s LR 56.1(a)(3) Stmt. at ¶¶ 25, 29, it did not provide them with the product's manufacturing specifications either. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 5. Puroon treated Midwest differently—it provided Midwest with a prototype *and* the manufacturing

15

specifications *only* after it agreed to sign the NDA. Pl.'s LR 56.1(a)(3) Stmt. at ¶¶ 13, 16. Contrast this to *National Presto*, where the defendant "could have purchased [the product] at the [plaintiff's] factory for about $22.00," 1990 WL 208594, at *9. Here, Midwest obtained access to the details of Puroon's invention only by working directly with Song and signing an NDA. Before that, it only had a video of a prototype. Pl.'s LR 56.1(a)(3) Stmt. at ¶¶ 10, 16.

"[R]easonable steps for a two or three person shop may be different from reasonable steps for a larger company." *Elmer Miller, Inc. v. Landis*, 625 N.E.2d 338, 342 (Ill. App. Ct. 1993). Given the fact that Puroon is a small, one-person company, a reasonable jury could find that Song's efforts—showing physical prototypes to a limited number of potential customers and granting full access to the prototype's manufacturing specifications only after an NDA was signed—were adequate to protect the Memory Book's secrets. *See also Rockwell Graphic Sys.,* 925 F.2d at 179–80 (noting that "only in an extreme case can what is a 'reasonable' precaution be determined on a motion for summary judgment").

Lastly, Midwest argues that, even if there is a dispute of fact concerning the existence of a protectable trade secret, there is no evidence that it misappropriated it. Def.'s Mem. Supp. at 23. It contends that it has used "embedded magnet technology" since at least 2009, long before Song approached it with the Memory Book. *Id.* Here, too, there is a factual dispute. Puroon argues that Midwest's "independent creation story" is suspect and depends wholly upon the credibility of Daniel, Midwest's owner. Pl.'s Resp. at 8–9. It contends that the Court should not

16

take Daniel's testimony at face value, pointing to facts that call his credibility into question. *Id.* For instance, Puroon avers that it was only *after* it passed along its manufacturing specifications that Midwest came out with the "Professional Mat Box," which Puroon characterizes as using technology "nearly identical" to the Memory Book. Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 31–36.

Furthermore, as Puroon points out, aside from Daniel's testimony, the record is devoid of any evidence such as "design files, notes or other technical documentation to explain how [Midwest] developed its box." *Id.* ¶ 37. Midwest responds merely that Daniel "does not use CAD to design his products," Def.'s Resp. Pl.'s LR 56.1(a)(3) Stmt. ¶ 37, ECF No. 64, and that he simply explained the specifications for the Professional Mat Box over the phone to Kim, Def.'s Ex. 1, Daniel Decl., at ¶¶ 5–8, ECF No. 62-1. But this explanation is difficult to square with the fact that Kim required technical specifications for the Memory Book before he could produce a prototype. Pl.'s Resp. at 16; Pl.'s LR 56.1(a)(3) Stmt. ¶¶ 16, 20. Given these facts, the question of Daniel's credibility must be decided by the jury. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[E]valuations of witness credibility are inappropriate at the summary judgment stage.") (citing *Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007)).

For these reasons, Midwest is not entitled to summary judgment as to Counts VIII and IX.

## V.   Claim for Breach of the NDA (Count III)

In Count III, Puroon claims that Midwest developed and distributed a competing product using information it had gleaned from the Memory Book in violation of the NDA. It also alleges that Midwest disseminated samples of the Memory Book to a third party without permission.

Both parties seek summary judgment on Puroon's claim in Count III that Midwest breached the NDA. Midwest argues only that Puroon does not have standing to enforce the NDA, because Song signed the agreement in her personal capacity, not her capacity as a representative of Puroon. Def.'s Mem. Supp. at 16–17; Def.'s Reply at 2–3, ECF No. 77. In response, Puroon points out that in Illinois, "the signature of a corporate officer may be effective as the signature of the corporation, even if the officer fails to indicate his corporate affiliation." *Blythe Holdings, Inc. v. Flawless Fin. Corp.*, No. 06-C-5262, 2009 WL 103196, at \*11 (N.D. Ill. 2009) (citing *People ex rel. City of Prospect Heights v. Vill. of Wheeling*, 498 N.E.2d 601, 603–04 (Ill. App. Ct. 1986)). Furthermore, the parties' course of dealing is relevant to this question, as are the designations on the agreement itself. *Id.*; *see also McCracken & McCracken, P.C. v. Haegle*, 618 N.E.2d 577, 582 (Ill. App. Ct. 1993) ("In determining whether it was the party's intention to bind the corporation principal or the purported agent individually, all the facts and circumstances surrounding the making of the contract are properly considered by the court . . . . [and] is a question of fact."). Midwest has not responded to this point of law, and thereby waives it. *See Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 924 (7th Cir. 2007).

18

Puroon argues that the parties' course of conduct shows that Song signed the NDA on behalf of Puroon, because Song's "corporate affiliation with Puroon was front and center during the NDA execution process," Pl.'s Resp. at 6. Indeed, Midwest received the NDA from a Puroon email address, "puroon.inc@gmail.com." Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 1; Pl.'s Ex. 2, ECF No. 68-11. And it sent the executed NDA back to the same address. Pl.'s Ex. 2. A reasonable jury could find from this evidence that Puroon, and not Song, entered into the NDA with Midwest, and that Midwest understood this. Accordingly, a genuine dispute of fact exists concerning the execution of the NDA, and summary judgment as to Count III is not supported by the record.

## Conclusion

For the reasons stated herein, Midwest's motion for summary judgment [61] is granted as to Counts I, II, VI, and VII, and denied as to Counts III, IV, V, VIII, and IX. Puroon's motion for partial summary judgment [58] is denied.

**IT IS SO ORDERED.**           ENTERED    11/2/18

_____
**John Z. Lee**
**United States District Judge**